UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
UNITED STATES OF AMERICA,


           --against--                               11 Cr. 824 (JS)


DOMINIC CEFALU,

               Defendant.
-------------------------------------------------------------------------X



# MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF
## DOMINIC CEFALU




ERIC FRANZ, ESQ.
Law Offices of Eric Franz P.L.L.C.
*Attorney for Dominic Cefalu*
747 Third Avenue, 20th Floor
New York, NY, 10017
Phone: (212) 355-2200
Fax: (212) 937-2217
*www.efranzlaw.com*

# TABLE OF CONTENTS

I. Preliminary Statement …………………………………………… 3

II. Discussion

    A. Legal Standard …………………………………………..... 6

    B. The Nature and Circumstances of the Offense ……………8

    C. The Presentence Report's Recommended Guidelines ……10

    D. Criminal History ………………………………………... 11

    E. Dominic's History and Characteristics

        1. Dominic's Post Offense Conduct Evidences

           Successful Rehabilitation ………..…………….. 12

        2. Dominic's Family …………………………… 19

        3. Dominic's Dedication and Charitable Work ……. 21

        4. Dominic's Age Renders Him Less Likely To Be A

           Recidivist ……………………………………….. 21

III. Conclusion ………………………………………………….. 23

# I.

## PRELIMINARY STATEMENT

On June 24, 2014, Mr. Dominic Cefalu ("Dominic"), who is 57 years old, will appear before Your Honor to be sentenced for conduct which ceased in December, 2006 – over 7 years ago.  Since that time, Mr. Cefalu has dedicated himself to his lawful career at Muraflex; a Canadian based architectural design company, which requires him to travel extensively throughout the Continental United States.  This employment enables Dominic to support his wife, Geralyn, and to financially assist his 4 children, 3 of whom currently reside with him in his marital home.  We respectfully submit that based on the passage of time since the offense conduct, Dominic's dedication to his employment, his lack of criminal activity in the last 7 years and the fact that no one was physically harmed or threatened by Dominic, or by anyone on his behalf, militate in favor of a lenient sentence.  Finally, of significance is the fact that a term of imprisonment will jeopardize all of Dominic's hard work and dedication – as he will lose his employment, which will also serve to cause a rippling effect on those who are gainfully employed as a result of Dominic's dedication to Muraflex. Quite frankly, at the age of 57, it will be virtually impossible for Dominic to obtain alternative meaningful employment upon his release. Thus, we respectfully submit that a sentence which enables Dominic to remain at liberty so that he can continue to be gainfully employed and live a productive life is appropriate.

### A.    Relevant Background

This case stems from an investigation which was performed by agents of the FBI in conjunction with Detectives from the Suffolk County District Attorney's Office.  *PSR ¶10*.  Said investigation included, but was not limited to, surveillance of Dominic and

3

wiretap recordings which were captured in 2006. *PSR ¶10.* After the wiretapping concluded, toward the end of 2006, twenty-four people were arrested, but not Dominic. All of the defendants, upon information and belief, entered guilty pleas (pre-indictment), with the exception of Frank Lonigro (a current co-defendant in the instant matter). Since Mr. Lonigro refused to plead guilty pre-indictment, a Suffolk County Grand Jury was empanelled. Dominic was then served with a subpoena to testify before the Suffolk County Grand Jury. Undersigned counsel then had a series of conversations with an assistant district attorney for the Suffolk County D.A.s office who repeatedly indicated that if Mr. Lonigro would enter a guilty plea, that Dominic would be released from his obligation to appear before the grand jury. The message was clear to undersigned counsel – if Dominic could "convince" Mr. Lonigro to plead guilty, that the subpoena would be moot. However, Dominic refused to attempt, in any manner, to influence Mr. Lonigro's decision on how to proceed. Thereafter, Dominic was offered immunity by the State (buy not by the Federal Government) and as a result refused to answer any questions before the grand jury. Dominic promptly entered a guilty plea to Criminal Contempt in February 2009 and was sentenced to 5 years' probation, which he successfully completed without incident. *PSR ¶49.*

That Dominic, who was subject to continued surveillance by the FBI as well as the supervision of the Department of Probation, successfully completed his probation, and did not engage in any additional criminal conduct, demonstrates that he is someone who has been successfully rehabilitated. Indeed, during the December 21, 2011 detention hearing which occurred following Dominic's instant arrest, the Court inquired of the government concerning any alleged criminal activity of recent vintage and the

government responded "My proffer is that the last incident was – of surveillance was that he attended either a wake or a funeral or a wedding, but it was in 2009." (*Tr. of Detention Hearing at page 50, attached as Exhibit A*).

Further Dominic adhered to his conditions of probation which demonstrates that he has turned his life around and is a suitable candidate for a non-custodial sentence. Indeed, since the date of his arrest on December 21, 2011, he has been subject to the oversight of Pre-Trial Services -- initially with home detention and electronic monitoring and a curfew.  Notably, almost 1 year following his arrest on this case, Your Honor acknowledged Dominic's compliance with his release conditions and modified them to remove the electronic bracelet:

> Defendant's application for the removal of the electronic monitoring bracelet is granted over the government's opposition. Despite the government's argument that the defendant has failed to assert any compelling reason to modify this condition, the Court disagrees. The change in circumstances that Court finds compelling is the recommendation of defendant's assigned Pre-trial Services officer. That recommendation is to remove the bracelet. The court discussed this issue with PTS and, based on defendant's total compliance with all conditions including curfew, approval of travel plans outside the Jurisdiction which will remain in place, the electronic monitoring bracelet is not necessary to comply with the Bail Reform Act. Moreover the, substantial bond is another factor that the Court has considered in granting this application and finds it to be sufficient with the other conditions to insure defendant's return to court and protect the community.

Order dated, 12/7/12; Dkt. Entry 46.

Furthermore, to date, Dominic has been permitted to travel throughout the country for work purposes and has been permitted (with approval from the Court) to travel to and

from Montreal, Canada on multiple occasions, religiously complying with his promise to abide by his conditions of release.

For all intents and purposes, Dominic has been subject to the watchful eye of law enforcement, probation and pre-trial services since 2006, and other than the instant offense, to which he pled guilty, (for conduct which occurred over 7 years ago) he has led a law abiding life while also complying with the various terms of his release.  That, we respectfully submit, is significant evidence that Dominic is worthy of a non-custodial sentence which will allow him to continue his trajectory as a law-abiding, productive member of society.

Thankfully, due to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), Your Honor is no longer tethered to the United States Sentencing Guidelines when fashioning an appropriate sentence. As this Court is well aware, a sentence should be sufficient, but not greater than necessary and should also promote respect for the law. To that end, we submit that compassion also promotes respect for the law and we urge this Court to impose a noncustodial sentence.

## II.

## **DISCUSSION**

**A.   LEGAL STANDARD**

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the guideline range, as well as any basis to depart from that range. However, the Court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor

among several in determining an appropriate sentence.  *Kimbrough v. United States*, 128 S.Ct. 554, 574 (2007). The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 128 S.Ct. 586, 596 (2007).  It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors.  *Id., Kimbrough*, 128 S.Ct. at 574, *citing Gall*, 128 S.Ct. at 597.

In determining a sentence that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. §3553 (a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of the defendant in each case. A consideration of those characteristics, along with the remaining seven factors,[1] may render sentences that do not fit within the guidelines, yet are "moored to fairness" and meet the goals of sentencing set forth in §3553 (a)(2). *See United States v. Ovid*, 2010 WL 3940724 *1 (EDNY, Oct. 1, 2010).

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 597. Rather, the Court must make an individualized assessment based on the facts presented. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted persons as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes

---

[1] The seven other factors are (1) the nature and circumstances of the offense; (2) the history and characteristics of the offender; (3) the need for the sentence imposed to reflect the goals of sentencing set forth in § 3553(a)(2); (4) the kinds of sentences available; (5) the Commission's policy statements; (6) the need to avoid unwarranted sentence disparities among similar defendants who commit similar crimes; and (7) the need to provide restitution to victims. *See* 18 U.S.C. §3553 (a).

magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Indeed, "[u]nderlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (internal quotations and citations omitted).

From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 128 S.Ct. at 570, *citing* 18 U.S.C. § 3553(a). The "not greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense." 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, 128 S.Ct. at 599; *see also Rita v. United States*, 127 S.Ct. 2456, 2465 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

## B. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Dominic accepts responsibility for his conduct as evidenced by his guilty plea. To avoid repetition, we hereby incorporate the recitation of the offense conduct contained in Joseph Cefalu's sentencing memorandum. Put simply, as Dominic informed the probation department, his involvement in the instant offense stemmed from John Doe #1's request that Joseph Cefalu invest monies in a business venture (the mortgage business at a time when the real estate market was booming), in return for points returned on the investment. *PSR ¶49*. However, over time this investment was converted to a

8

loan, which involved a usurious rate of interest.  It bears emphasis that the return on investment/points were not demanded by Joseph or Dominic Cefalu, but was offered by John Doe#1 to induce Joseph to invest/loan the money.  While this is not a legal justification for Dominic's actions, it certainly lends context to the simple fact that neither Joseph nor Dominic were in the business of lending money to multiple individuals in exchange for usurious returns.  Indeed, despite all of the wiretaps and investigation, the fact remains that the only "loans" which were extended were to John Doe #1.

Notably, there is no violence in this case.  No one was harmed and, notwithstanding the significant outstanding debt of "John Doe #1" (whose identity we have always known, but we exercise discretion in not revealing it in this public filing), he was never harmed or threatened by Dominic, or anyone on Dominic's behalf.  Indeed, during the plea proceeding, the following colloquy illuminated that the offense of conviction did not involve violence:

| | |
|---|---|
| THE COURT: | Tell me what it is you did. You just gave me a legal definition. I mean, you made an agreement with other individuals that you would use force to collect a debt? No force? |
| MR. FRANZ: | No force. Judge, this is a collection of an unlawful debt which only requires that the debt to be collected was something is that was twice the usurious rate in New York; twice the permitted rate in New York. There is no element of violence whatsoever for it. |
| THE COURT: | Is that the government's position? That there was no threat or physical harm or anything of that sort? |
| MR. TOOSSI: | In terms of the plea to what – in terms of the element of the crime that the defendant is pleading guilty to, that's correct, your Honor. |

*Transcript of Plea Proceeding, 14-15, attached as Exhibit B.*

Thus, when determining the appropriate sentence for Dominic, we urge the Court to consider that, even though Dominic was well-aware of the identity of "John Doe #1",[2] and even though the debt remained outstanding, that no harm was visited upon him by Dominic, or anyone on Dominic's behalf.[3]

## C.      THE PRESENTENCE REPORT'S RECOMMENDED GUIDELINES

On June 28, 2013, Dominic appeared before Your Honor and pleaded guilty to Count Two, pursuant to a plea agreement (Collection of Unlawful Debt Racketeering Conspiracy between August 2004 and December 2006). The PSR provides for the following Guideline's calculation:

| | |
|---|---|
| Base Offense Level (§2E1.1(a)(1)) | 19 |
| Adjustment for Role in the Offense (§3B1.1(b)) | +3 |
| Adjusted Offense Level | 22 |
| Acceptance of Responsibility (§3E1.1(a)(b)) | -3 |
| **Adjusted Offense Level** | **19** |

---

[2]      ¶12 of the PSR states that the identity of John Doe #1 was not revealed for the sake of his safety. We objected to the inclusion of this inflammatory remark since we are well-aware of the identity of John Doe #1, and are prepared to prove same should the Court so require.

[3]      The PSR, at ¶22 alleges that Dominic authorized Lonigro and Gerrato to threaten John Doe #1 with physical harm. As stated in our PSR objection letter, we dispute that Dominic ever threatened John Doe #1 or directed or authorized anyone to deliver any threats to John Doe #1.  (*PSR objection letter, dated February 20, 2014, attached as Exhibit C).*

Further, ¶22 also states that Dominic  "threatened to put John Doe #1 'in a coma'" if he failed to make his payments. Significantly, this remark was unfortunate but it was simply Dominic venting his frustration concerning the actions of John Doe #1, but it was harmless in that no harm was visited upon John Doe #1, nor was he ever made aware of this statement by anyone on behalf of Dominic. We notified probation that the PSR should be supplemented to reflect that Dominic's statement was not made to John Doe #1, but rather to Frank Lonigro, and that Mr. Cefalu never directed or authorized Mr. Lonigro to communicate that threat to John Doe #1. And – it wasn't.

Further, the PSR acknowledges that the plea agreement provides for an additional 1-level reduction due to the global disposition pursuant to U.S.S.G. §5K2.0.  *PSR ¶96; Plea Agreement ¶¶2, 14.*  Thus, should the Court credit this global disposition reduction, Dominic's adjusted offense level is 18.  Since he is in Criminal History Category I, his advisory guidelines range is 27-33 months.

**D.      CRIMINAL HISTORY**

Although the PSR provides that Dominic is in Criminal History Category I, we object to the calculation of 1 criminal history point for Dominic's 2009 conviction for criminal contempt.  *PSR ¶49.*

While this single criminal history point does not elevate Dominic's Criminal History Category – he remains at CHC I, we respectfully submit that this point is misplaced due to the fact that Dominic's refusal to answer questions concerning the underlying activity is relevant conduct to his offense of conviction.  Relevant conduct, pursuant to U.S.S.G. §1B1.3(a)(1)(A&B) includes acts "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

Dominic's refusal to answer questions by the Suffolk County Prosecutor during the grand jury proceeding which was investigating the underlying investigation of this matter is certainly relevant conduct to this offense of conviction.  Simply put, Dominic, concerned that the offered immunity from the state, would not insulate him from a federal prosecution, chose not to answer said questions. Thus, his criminal contempt conviction (for which he was already sentenced) is surely relevant conduct concerning his instant

11

offense and thus, should not result in any criminal history points. Academic, this may be, since Dominic remains in Criminal History Category I, the fact remains that this single point is inappropriate.

**E.    DOMINIC'S HISTORY AND CHARACTERISTICS**

   **1.    DOMINIC'S POST OFFENSE CONDUCT EVIDENCES SUCCESSFUL REHABILITATION**

In determining a sentence that is "sufficient, but not greater than necessary," Dominic's post-offense conduct cannot go without significant consideration. 18 U.S.C. §3553 (a)(1). Under the pre-*Booker* guideline regiment, post-offense rehabilitation constituted a basis for a downward departure if such rehabilitation was atypical and extraordinary. This case presents a truly exceptional example of post-offense rehabilitation that falls far "outside the heartland" of cases contemplated by the guidelines and warrants considerable leniency. Not only has Dominic pleaded guilty and accepted responsibility for his 2006 conduct, but he has used the past eight years of his life to essentially reinvent himself.

Section 5K2.0 of the guidelines allows a district court to "impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.' " U.S.S.G. § 5K2.0 (2002) (quoting 18 U.S.C. § 3553(b)). A "departure under § 5K2.0 is warranted only if the defendant's efforts are exceptional enough to be atypical." *United States v. DeShon,* 183 F.3d 888, 889 (8th Cir.1999); *see Koon,* 518 U.S. at 96, 116 S.Ct. 2035. Atypical post offense rehabilitation itself is a basis for departure. *See United States v. Chapman*, 356 F.3d 843, 847-49 (8th Cir. 2004).

12

Here, Mr. Cefalu's rehabilitation since the offense conduct (which took place over seven years ago) can only be described as exceptional and atypical. Notably, his rehabilitation commenced prior to his arrest in the instant matter. *Chapman*, 356 F.3d at 847-49; s*ee also United States v. Newlon,* 212 F.3d 423, 424 (8th Cir.2000).[4]    This "self-motivated rehabilitation lends strong support to the conclusion that imprisonment [is] not necessary to deter [Dominic] from engaging in future criminal conduct or to protect the public from his future criminal acts." *Gall*, 522 U.S., at 59. Indeed, the man this Court will sentence is a not the same man who committed the instant offense. He has changed and rehabilitated himself. This Court's duty is to "*sentence the defendant as he stands before the court on the day of sentencing,*" -- a changed and rehabilitated man. *United States v. Bryson,* 229 F.3d 425, 426 (2nd Cir. 2000).

\*\*\*

First, there is no question that Dominic has lived a law abiding life since 2007. Dominic has been under the watchful eye of the government for many, many years.  The underlying investigation included surveillance of him on multiple occasions and he has no doubt been surveilled by the government in the years since. Following his conviction in state court, Dominic was sentenced to a five-year term of probation, on February 10,

---

[4] We also note that many analogies may be drawn between post-offense rehabilitation in this case and post-sentencing rehabilitation. In *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011), the Court held that "evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing." *Id.* The Court went on to state, "[m]ost fundamentally, evidence of [the defendant's] conduct since his release from custody [] provides the most up-to-date picture of [defendant's] "history and characteristics." *Id.* In that case, the defendant was sentenced in 2004 and then sentenced again in 2009. Since his first sentence, the defendant "had been drug-free for nearly five years, had attended college and achieved high grades, was a top employee at his job slated for a promotion, had re-established a relationship with his father, and was married and supporting his wife's daughter." *Id.*

2009.  Thus, in addition to the surveillance being conducted by the FBI, Mr. Cefalu was also monitored by his probation officer.  He completed his probation, without any incident, and the transcript of the bail proceedings in this matter reveal that the only activity of Mr. Cefalu to which the government ascribes significance since 2007, is his attendance at a wake in 2009. (AUSA: "My proffer is that the last incident was – of surveillance was that he attended either a wake or a funeral or a wedding, but it was in 2009." *Tr. of Detention Hearing at page 50, attached as Exhibit A).*

Further, Dominic's gainful employment in the last several years demonstrates his rehabilitation.  Dominic works for Muraflex, an architectural wall manufacturer based in Montreal, Canada. *PSR ¶65*.   In 2010, when, its owner, Fernando Patreccia was considering purchasing the company, he knew he needed to find someone to handle the business based in New York. *Exhibit D page 1*.  After an extensive search, he turned to Dominic:

> I made numerous inquires to my contact in the construction industry, asking who they would recommend to handle such an important role. Surprisingly, the one name that continued to surface was Mr. Cefalu's. I contacted Mr. Cefalu and after numerous discussions convinced him to join our team.

*Exhibit D page 1.* Once hired, Dominic helped launch Muraflex from a struggling business that was bought out to the premier architectural wall manufacturer in North America:

> Dominic hit the ground running, assisting in bringing new business opportunities to the table.  In the past 4 years Mr. Cefalu's direct efforts have helped take the company from $3 million to $25 million in gross sales. This past November he made the final presentation on a project in Boston, Mass called Manulife (a division of John Hancock) which awarded us this $3.1 million project.

*Id.*

Mr. Patreccia explains that Dominic is **"considered the number one expert in the architectural wall industry"; "the face of [Muraflex] in the US"; an "ultimate professional [who] treats everyone he meets with respect and dignity and his greatest attributes are his integrity and honesty"**:

> His knowledge of the industry is surpassed by none and he is considered the number one expert in the architectural wall industry.
>
> Further, he is solely responsible for training our Dealers, Representatives and the installation teams around the Country. He is our face in the US, meeting with company executives from the major architectural and construction firms throughout the country. In the past 4 years the feedback is consistently the same. Dominic Cefalu is the ultimate professional. He treats everyone he meets with respect and dignity and his greatest attributes are his integrity and honesty.
>
> His dedication and hard work speaks for itself. He travels to every major city in the US and is on the road 5 days a week running and maintaining our US operations. From Boston to Florida, Philadelphia and Washington DC, Chicago and Houston, to Seattle and Los Angeles, Dominic Cefalu manages it all with confidence expertise and success.
>
> Mr. Cefalu is directly and physically involved with all our open projects, specifically 2 active and overlapping projects, (HMA) Hyundai Motors of America In Fountain Valley, CA and (AAMC) Association of American Medical Colleges in Washington, DC. Both are extremely large, high profile projects that require high level management and expertise. HMA is expected to complete by mid-April and AAMC begins February 1 and will run through July. Falling in the middle of both is the 2nd phase of Manulife. He recently managed the 1st phase to a successful completion. The client has made it quite clear to us that they expect his presence on the remaining phases.

*Id. at 1 - 2.*

Further, Mr. Petreccia has provided us with letters of business relations who have worked with Dominic and found his work and management to be exceptional. *Exhibits E-G.* These letters demonstrate how Dominic is specifically requested by clients and projects have been saved by his expertise and skill:

> Astral was very happy with the performance and execution of the project. If it were not for Dominic's expertise and client networking skills this could have been a real problem.
>
> […]
>
> We would be happy to work with Muraflex in the near future and hope that Dominic can manage them as well.

*Letter from Stephen Taball of CIME Décor; Exhibit E.*

> Dominic Cefalu has worked with me on several projects In the past couple of years. In the time I have known him I can state, with extreme certainty and confidence, that he has done what has been asked of him and beyond. He has handled himself with great professionalism and integrity in all the time that I have known him.
>
> The great testament to his good work has been the stream of great projects that Muraflex has been able to complete with Tishman. Dominic is often requested by our clients specifically to be in charge and represent Muraflex.
>
> Dominic is an important part of our execution team and his good work has contributed to Muraflex being specified over and over with our clients.

*Letter from Julie Geden of Tishman Construction; Exhibit F.*

> We were in danger of ruining our reputation in DC until Dominic put together a plan to address all the issues the different intervenants were facing. .  .  . Dominic was able to put an end to those charges as we began to improve on our deliverables.

*Letter from Jorge Garayta of the Garayta Group; Exhibit G.*

These letters demonstrate that Dominic is uniquely suited for his position with the knowledge, experience and relationships to ensure the company's continued viability and development.

We further submit that a lenient sentence is warranted in order to prevent an unjust and "extraordinary impact that the loss of his daily involvement would have on his business and, consequently, on his employees." *United States v. Milikowsky*, 65 F.3d 4, 8-9 (2d Cir. 1995).

There can be no doubt that Dominic's expertise and efforts have made him invaluable and irreplaceable both to Muraflex and to the architectural wall industry. He is a key factor to the quality and success of Muraflex – without him, the company will falter and others will suffer financially. Mr. Petreccia advises:

> […] my main responsibility must be to my company and the many employees that count on their jobs to feed their own families. So with that I implore that you not incarcerate Mr. Cefalu, because by doing so would be devastating to Muraflex and all those who rely on us to make their living. I can assure you that without Mr. Cefalu many people will lose their jobs. We will not be able to replace him, impacting our ability to operate at the high level required by our US customers. Loss of business equals loss of jobs.

*Exhibit D page 2*.   Without Dominic, Muraflex will not be able to maintain their standards of high quality which will lead to a drop in business and cost employees their jobs.

In *Milikowsky*, the Court imposed a lenient sentence on a defendant it found to be indispensable to the defendant's businesses. The defendant in that case was found by the Court to be the only individual "with the knowledge, skill, experience, and relationships

17

to run Jordan, the steel trading concern, on a daily basis: he is the sole buyer of all steel, the only person with the requisite ability and contacts to buy steel at competitive rates, the most successful seller, and the person who deals with Jordan's customers and suppliers." *Id.*

Here, as described by Mr. Petreccia, the unfortunate reality is that the prospect of Dominic going to prison now, for conduct which occurred years before Mr. Petreccia met Dominic, presents a potential economic hardship to Mr. Petreccia and potential job loss for many employees, while also destroying all of the gains that Dominic has accomplished and earned over the past several years developing a life for himself devoid of criminal conduct.

We submit that a term of imprisonment for Dominic would have "extraordinary effects on his employees to a degree not adequately taken into consideration by the Sentencing Commission." *Milikowsky*, 65 F.3d 4, 8-9. Probation is warranted "where, as here, imprisonment would impose extraordinary hardship on employees." *Id.* "As we have noted in similar circumstances, the Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom." *Id.* (internal citations omitted).

In sum, Dominic's actions over the last 7+ years prove his rehabilitation.  His exemplary post-offense conduct which began prior to his arrest in this matter warrants considerable leniency as he has demonstrated that he is no longer the same individual who engaged in the 2006 offense conduct.  Further, his contributions to Muraflex, his integrity and honesty as well as the undeniable impact his potential imprisonment could

visit on innocent, hard-working people, all weigh heavily in favor of a non-custodial sentence.

### 2.    DOMINIC'S FAMILY

Dominic comes from a loving family.  His parents are elderly (Riccardo Cefalu, age 86, and Jean Cefalu, age 76) and suffer from various maladies which unfortunately accompany one's senior years.  Riccardo and Jean are "heartbroken" by this situation but Dominic has done his best to try to keep them positive. *PSR ¶55.*

It cannot go unstated that throughout the last 2 ½ years since the instant arrest, Dominic has been unable to have any contact with his brother Joseph, due to the conditions of his release. *PSR ¶55.*  This has proven to be an uncomfortable and humiliating situation.  Not only is Dominic precluded from seeing his brother Joseph, since Joseph lives upstairs in his parents home, when Dominic goes to visit with his parents, steps have always been taken to scrupulously honor the terms of his release. Suffice to say that this case has taken its toll on Dominic and his family.  His inability to have contact with his brother, Joseph, has been a form of punishment, in and of itself.

Dominic has been married to his wife Geralyn since 1980. *PSR ¶56.*  They have a strong and supportive relationship where Dominic is the sole provider for the family. Geralyn spends a considerable amount time caring for her elderly father who suffers from a serious respiratory illness. *PSR ¶57.* Geralyn suffers from health concerns of her own including emphysema and chronic obstructive pulmonary disease. *PSR ¶56.*  Geralyn is unemployed and spends her time tending to her medical needs, and those of her father and continues to nurture and care for their children.  Put simply, since Dominic is the sole

financial supporter of his family, his incarceration will deliver a severe impact on the well-being of his family.

Together, Dominic and Geralyn have four children; Richard, age 32, Natalie, age 25, Dominic, age 23, and Michael, age 18. *PSR ¶58*. The youngest three children still live with Dominic and Geralyn where they are supported while they continue their education and start their careers. Dominic and Geralyn have provided financial and emotional support helping their children develop into productive young adults with bright futures who Michael and Laura Deblasi describe as "four of the most respectful children on can ask for." *Exhibit H*.  No one can know the extent of the impact removing Dominic from their lives for a period of time would have, but we do know that removing their father, a source of financial and emotional support and guidance, would have repercussions on the lives of these young adults.

Dominic's generosity with guidance and advice extend beyond his immediate family.  M. D. (initials were used because the individual is known to be a minor) has known his Uncle Dom as someone who taught him to keep an open mind and not be to quick to judge someone.  *Exhibit H*.  M. D. even wrote an essay for school describing how his Uncle Dom is an important person in his life, a person he has learned from and someone he goes to for advice.  *Exhibit I*.  M. D. has now asked Dominic to be his sponsor for Confirmation. *Exhibit H*.

Moreover, Michael and Karen Deblasi, parents of M. D. who wrote about his Uncle Dom, know the current Dominic Cefalu.

> We do not know of his past or what he is charged with, as
> far as we are concerned his past is his past and we do not
> need nor want to know of it.  What we can tell you about is

the person we met roughly five years ago thru a mutual friend.

*Exhibit H*.

Dominic is the type of guy that drops whatever he is doing if you need a hand with anything.  If he calls you and asks what you are up to and you tell him you are helping a friend or a neighbor with something the next question is, where are you? I'm on my way.  The Dominic we know is a Hard working, family oriented all around good person.  He is the backbone of his family and has touched our family's hearts in many ways.

*Exhibit H*.

### 3.      DOMINIC'S DEDICATION AND CHARITABLE WORK

Dominic does not rest on his accomplishments alone.  He is a dedicated and hardworking employee, traveling tirelessly on behalf of Muraflex. *Exhibit D*. He would not have achieved the success he has with Muraflex if he had not put in the necessary time and dedication.

His hard work and commitment are also evident in his charitable work with the Knights of York. Dominic helped found this charity and "his tireless dedication in the early years" established the foundation on which the charity operates today. *Exhibit H*. The Knights of York, through their dedication to helping children in need, have sponsored summer camps, provided funding for children's hospitals and create educational opportunities for children with developmental disabilities.  Thomas Peterson, the current president of the Knights of York, describes Dominic as "[a]lways the first to volunteer and the last to leave an event." *Exhibit H*. Dominic's efforts have helped the Knights of York enrich the lives of countless children.

### 4.   DOMINIC'S AGE RENDERS HIM LESS LIKELY TO BE A RECIDIVIST

Dominic is 57 years old, and is in Criminal History Category I. Generally, recidivism for those over 50 is extremely low. A 2004 Sentencing Commission study found that, "[r]ecidivism rates decline relatively consistently as age increases, from 35.5% under age 21 to 9.5% over age 50." *Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines*, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate, 12 (May 2004). Indeed, a number of courts have recognized that recidivism is "markedly lower for older defendants."[5] In *United States v. Hodges*, *2009 WL 366231 (E.D.N.Y. Feb. 12, 2009)* Judge Sifton held that in the post-*Booker* world, Judges may take this age-recidivism relationship into consideration when sentencing a defendant. Specifically, Judge Sifton stated, "[t]he Guidelines do not take into account the inverse relationship between age and recidivism. Accordingly, I will also take into account defendant's age in fashioning his sentence." *Hodges*, at *27. *See also United States v. Hamilton, 323 Fed.Appx.27, 31 (2nd Cir. 2009)*(district court abused discretion in not taking into account policy considerations with regard to age recidivism not included in the guidelines – remanded for resentencing). We submit this court may also consider Dominic's age and his low risk of recidivism in imposing a sentence.

A sentence of imprisonment will result in the loss of Dominic's employment. At the age of 57, it will be virtually impossible for Dominic to develop a new career upon his release. Gainful employment is a significant factor in deterring one from engaging in

---

[5] *United States v. Hodges*, 2009 WL 366231 *27 (E.D.N.Y. Feb. 12, 2009) (citing *U.S. v. Eberhard*, 2005 WL 1384038, at *10 n.3 (S.D.N.Y. June 9, 2005); *U.S. v. Coleman*, 370 F.Supp.2d 661, 681 (S.D.Ohio 2005); *Simon v. U.S.*, 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005); *U.S. v. Hernandez*, 2005 WL 1242344, at *5 (S.D.N.Y. 2005); *U.S. v. Carmona-Rodriguez*, 2005 WL 840464, at *5 (S.D.N.Y. 2005); *U.S. v. Nellum*, 2005 WL 300073, at *3 (N.D.Ind. 2005).

criminal activity.  If the goal of prosecuting Dominic for conduct that occurred more than seven years ago is to prevent him from engaging in that conduct in the future, the best solution would be a non-custodial sentence so that he can remain employed and continue the life he has established free of criminal conduct.

## **CONCLUSION**

Dominic has taken responsibility for his conduct and feels an incredible amount of remorse as a result of his actions. We respectfully submit that the passage of time since this non-violent offense conduct, Dominic's successful completion of probation (from his criminal contempt conviction) since that time, his abidance with all of his pre-trial release conditions in this case, and his growth as a country-wide professional for Muraflex, all demonstrate that he is rehabilitated and that a custodial sentence would not only be unnecessarily  harmful to his family and those whose livelihoods prosper due to Dominic's role at Muraflex, it would also simply be "greater than necessary".

As such, we respectfully request that Your Honor fashion a sentence that will enable Dominic to continue upward as a contributing, law abiding citizen. We therefore submit that a noncustodial sentence is an appropriate sentence in this case.

Respectfully Submitted,

_____
ERIC FRANZ, ESQ.
Law Offices of Eric Franz P.L.L.C.
*Attorney for Dominic Cefalu*
747 Third Avenue, 20th Floor
New York, NY, 10017
Phone: (212) 355-2200
Fax: (212) 937-2217

23

*www.efranzlaw.com*