

U.S. Department of Justice

United States Attorney
Eastern District of New York

EAG:AHT
F. #2011R01634

271 Cadman Plaza East
Brooklyn, New York 11201

October 1, 2014

By Hand and ECF

The Honorable Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722-4438

    Re: United States v. Dominic Cefalu
       Criminal Docket No. 11-824 (JS)

Dear Judge Seybert:

    On June 28, 2013, the defendant Dominic Cefalu pleaded guilty pursuant to a plea agreement to Count Two of the indictment, which charged the defendant with conspiracy to collect an unlawful debt, in violation of 18 U.S.C. §§ 1962(d) and 1963. Cefalu is scheduled to be sentenced on October 3, 2014. For the reasons set forth below, the government respectfully submits that a sentence within the applicable advisory Guidelines range is appropriate, and is "not greater than necessary," to achieve the objectives of sentencing. 18 U.S.C. § 3553(a).

I. Background

    As stated in the Indictment and other court filings, between 1981 and 2006, Dominic Cefalu held positions of increasing levels of trust within the Gambino family. Specifically, he was an associate, then a soldier, and finally, a captain of a crew within the Gambino family.[1] Joseph Cefalu (Dominic Cefalu's brother), Salvatore Gerrato and Frank Longiro were associates of the Gambino family. (Presentence Investigation Report ("PSR") ¶ 12).

---

[1] The defendant contends that, because he did not specifically allocate to being a member of the Gambino crime family, the Court should disregard this affiliation. This contention is meritless. Although the government agreed that the defendant's admission that he was a member of an enterprise was sufficient for allocution purposes, the government's evidence overwhelmingly establishes that the enterprise was the Gambino crime family and could so prove if required to do so at a Fatico hearing.

The evidence against the defendant, which included court-authorized wiretaps, law enforcement surveillance and a consensual recording,[2] established that (a) Gerrato and Lonigro were giving a portion of their gambling profits to Dominic Cefalu and (b) Dominic and Joseph Cefalu had extended loans to a debtor, John Doe #1, at a usurious rate of interest – which Lonigro and Gerrato helped to collect – and were willing to use fear, intimidation and violence to collect the debt.

A.    Extortionate Extension and Collection of Credit from John Doe #1

Between August 2004 and December 2006, Dominic Cefalu, Joseph Cefalu, Frank Lonigro, and Salvatore Gerrato conspired to engage in the extortionate extension of credit to, and collection of credit from, John Doe #1, and engaged in the extortionate extension of credit to, and collection of credit from John Doe #1.

In late 2004, Dominic and Joseph Cefalu agreed to loan John Doe #1 $50,000, at a rate of two "points" of interest per week, a rate that is at least twice that of the enforceable rate under New York State Penal Law Section 190.40. The initial payments on this loan were $1,000 per week. Between 2004 and 2006, John Doe #1 borrowed an additional $250,000, from Dominic and Joseph Cefalu. By 2006, the weekly payment on the interest alone was $3,000 per week. John Doe #1 understood that at least $50,000 of the money he borrowed came directly from Dominic Cefalu, and understood Cefalu's role within the Gambino family.

During the same time period, John Doe #1 incurred $150,000 in gambling debts owed to Lonigro, and $300,000 owed to Gerrato. In addition, John Doe #1 owed $50,000, to an unindicted individual, loosely associated with the Gambino family. With respect to payments, John Doe #1 made sure to make payments to Joseph and Dominic Cefalu first.

John Doe #1 made weekly payments to Joseph and Dominic Cefalu until December 2006. In his efforts to maintain his payments on his outstanding debt, John Doe #1 sold a piece of property to Gerrato to liquidate the equity he had in the property to use as a large payment of what was owed to Joseph and Dominic Cefalu. Further, telephone calls intercepted between John Doe #1 and Joseph Cefalu indicate that the large payment (of approximately $75,000) was an effort by John Doe #1 to eliminate the interest that he had already been paying for one and a half years and begin paying down the principle. On several occasions, John Doe #1 was verbally threatened if he failed to continue to make payments as directed. On one such occasion, Gerrato chased John Doe #1 in his car from a location on the south shore of Long Island to Joseph Cefalu's jewelry store in East Northport, New York. On another occasion in late 2006, Gerrato went to John Doe #1's home, threatened him, and took a swing at John Doe #1's face. John Doe #1 did not sustain injury during the scuffle.

---

[2]    The defendant asserts that the instant investigation was a joint investigation between state and federal authorities. This is not true. Rather, the evidence described above was gathered during an investigation conducted by the Suffolk County District Attorney's Office. The federal investigation was instituted several years after the state case ended.

B. Illegal Gambling Operation

Between March 2006 and December 15, 2006,[3] Gerrato and Lonigro ran a "sportsbook" gambling operation, in part, out of the Tomato & Basil Pizzeria. Bets could be placed by, either calling a telephone number, or by logging onto a website "betswi.com." Individuals who placed bets via either method generally "settled up" their accounts weekly. Together, Gerrato and Lonigro managed all aspects of the operation, including: paying out winning bets; collecting money on losing wagers; paying fees to the wireroom for the telephone line for accepting bets; and, communicating with the offshore wireroom to receive information regarding gambling accounts. In addition, Lonigro and Gerrato each utilized the services of at least four "runners," or individuals who go between bettors who place wagers and the gambling operation taking the wagers. The gambling business generated in excess of $2,000 per day in wagers.

During 2006, Lonigro "paid up," or provided payment in exchange for protection, to Dominic Cefalu from the proceeds of the gambling business. Early in the gambling business, Gerrato also paid up to another Gambino family captain; however, as that relationship soured, Gerrato enlisted Lonigro's assistance to negotiate a transfer of Gerrato to Dominic Cefalu's protection, which was accomplished by the summer of 2006. From the summer of 2006 on, Gerrato also paid up to Dominic Cefalu.

II. Guidelines Calculation

As set forth in the plea agreement between the defendant and the government dated June 28, 2013 (the "Plea Agreement") and in the PSR, the adjusted offense level is 18, which, based on a criminal history category of I, carries a range of imprisonment of 27 to 33 months.

III. Argument

A. Legal Standard

In the Supreme Court's opinion in United States v. Booker, 543 U.S. 220, 222 (2005), which held that the Guidelines are advisory and not mandatory, the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentence, but also may tailor the sentence in light of other statutory concerns. See 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain

---

[3] On December 15, 2006, Lonigro and Gerrato were arrested by police in Suffolk County, New York, and were charged with, among other things, Enterprise Corruption and Promoting Gambling in the First Degree. Both Longiro and Gerrato later pled guilty in connection with these charges (Gerrato pled guilty to Promoting Gambling in the First Degree, and Lonigro pled guilty to Enterprise Corruption, Promoting Gambling in the First Degree, Possession Gambling Records, and Conspiracy in the First Degree).

3

under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

B. Discussion

A sentence within the Guidelines range determined by the Court is plainly warranted here. The very serious nature of the underlying offense and the defendant's supervisory role in the offense weigh heavily in favor of a sentence within the advisory guideline range for the purposes of punishment and promoting general and specific deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A) & (a)(2)(B).

In light of the defendant's lengthy history of involvement in criminal activity and his history as a supervisor in the Gambino family, a powerful organized criminal group, a significant sentence of incarceration in this case is appropriate in order to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Indeed, a probationary sentence could well promote disrespect for the law. See, e.g., United States v. Cutler, 520 F.3d 136, 154 (2d Cir. 2008) (concluding that the district court made errors in certain "Guidelines applications and in its departure decisions; that the sentences imposed did not properly interpret certain of the sentencing factors that the court was required to consider under 18 U.S.C. § 3553(a), such as just 'punishment' and deterrence of others; and that some of the court's rationales would promote disrespect for the law").

As noted above, the defendant was a captain in the Gambino crime family. The wiretap evidence in this case demonstrates Dominic Cefalu's leadership position in the Gambino crime family. Specifically, the wiretap recordings demonstrate that Dominic Cefalu was providing "protection" from the Gambino crime family to Lonigro and Gerrato in the latter half of 2006. This type of extortionate relationship – commonly referred to as an "umbrella" – is reflected in numerous intercepted recordings between Lonigro, Gerrato and others. For example, Lonigro repeatedly refers to Dominic Cefalu as "my guy" and being "with" Dominic Cefalu, terms commonly used to refer to inducted members of the Gambino crime family. Moreover, in a series of intercepted telephone calls between March 2006 and December 2006, Gerrato and Lonigro discussed resolving a dispute with another gambling operation by sending "Dom," their "wiseguy" – a reference to the defendant – to "send a message" to the other gambling operation. In yet another intercepted conversation between Lonigro and a co-conspirator in the illegal sports gambling operation, Lonigro stated that

4

Dominic Cefalu was "bumped up a notch," meaning that he had been promoted within the hierarchy of the Gambino crime family.

As a captain in the Gambino crime family, the defendant had the power and influence to instruct others to engage in violent acts, and the evidence in this case demonstrates that he wielded that power in order to maintain his illegal sources of income. For example, on November 6, 2006, the following conversation between Dominic Cefalu, Gerrato and Lonigro was intercepted as the three men spoke inside of the Tomato & Basil pizzeria:

> D. CEFALU: By Thursday, by Thursday I want answers. By Thursday I want real answers, I don't want no bullshit answers, I want real fucking answers.
>
> LONIGRO: Can't put pressure on this kid. Well, he can a little bit. Then the other guy can (U/I) you can't (U/I) just to get him a little scared.
>
> D. CEFALU: Why can't I put pressure?
>
> GERRATO: Well, that's if ...
>
> LONIGRO: What?
>
> D. CEFALU: Why can't I put pressure on him?
>
> LONIGRO: You can't put pressure on [John Doe #1].
>
> D. CEFALU: Why not?
>
> GERRATO: (Laughing) He's worried about you turning him into a rat ...
>
> D. CEFALU: Oh, god.
>
> GERRATO: He's afraid of you, bro.
>
> LONIGRO: Bro, he'll freak the fuck out, cry to your brother, your brother will freak the fuck out, say something to your father, your father will say something to you.
>
> D. CEFALU: So what?
>
> LONIGRO: It's just, it's gonna make it sticky ...
>
> D. CEFALU: I can tell you right now, I am not gonna do with him what you're doing with Matt. Because I'm gonna fucking rip that kid a new asshole in three seconds, in three seconds ... cause he, if I don't hear what I want to hear, already I'm thinking, I got to be

5

>
> honest with you I'm already thinking that, with money that we are all talking about, we're never gonna see it.
>
> GERRATO:   I don't believe that.
>
> D.CEFALU:  I really feel strong about that ...
>
> GERRATO:   I do believe this, I do believe this, they, he got, the whole thing is "My lawyer's controlling the money and he's gonna wire transfer me money." I believe his lawyer did give him some money and like you said he used it to keep his business going or his house, whatev, he used the money.
>
> D.CEFALU:  I'm gonna tell you right now, I'm gonna tell him if we don't get our money right away, I want to know when we're getting our, I don't want to hear this few week bullshit. I want to know when <u>we are getting our fucking money and at some point, at some point, I'm gonna put him in a coma, I'm gonna go on vacation, go far away, go sit on a beach somewhere, put him in a fucking coma on a respirator</u>.

Contrary to the defendant's contention that this was an "unfortunate" remark that did not represent a threat of physical harm, based on this conversation and others, Dominic Cefalu demonstrated the ability and willingness to use his position to threaten violence to other individuals through his subordinates. Simply put, the defendant knew that he could direct his subordinates – including Lonigro and Gerrato – to harm John Doe #1. This was not simply "venting," as the defendant attempts to characterize his threats. These statements, when uttered by a captain in the Gambino crime family, have consequences, and there can be no doubt that Lonigro and Gerrato understood as much.

      The defendant's history and characteristics also favor a sentence within the applicable advisory Guidelines range. Indeed, Dominic Cefalu's roots in the Gambino crime family run deep: his father, Ricardo Cefalu, is a Gambino family soldier and his first cousin, Domenico Cefalu, is the current boss of the Gambino crime family. Furthermore, Dominic Cefalu's association with the Gambino crime family spans decades. In 1981, Dominic Cefalu was convicted in this District of possession of heroin with intent to distribute and was sentenced to 84 months' incarceration. In an intercepted conversation between Dominic Cefalu, Gerrato and Lonigro, Cefalu described his father's involvement in that case:

> D. CEFALU:  I got arrested for junk.[4]  There was a lot of things that's, um, not only a junk case. It was racketeering ... We had everything, murder, you name it, we hung it.

---

[4]    Based on the charges in the case that the defendant was referring to, his reference to "junk" was a reference to heroin.

6

> [...]
>
> LONIGRO: You did five years or something?
>
> D. CEFALU: I did five ...
>
> LONIGRO: Your father did fifteen.
>
> D. CEFALU: No, my father did seven. I had a seven year sentence, but I was facing twenty-five, my father was facing life.

The defendant's prison sentence, and his father's even lengthier sentence, in the early 1980s did not deter the defendant from pursuing a life of crime. Indeed, the defendant's ascension to the rank of captain in the Gambino crime family in 2006 demonstrates that his criminal activity continued well after his release. The degree to which the defendant has been able to escape punishment for his crimes over such an extended period of time results, in large part, from the fear of cooperating with law enforcement that the defendant, and other members of the Gambino crime family, placed in the community. The Court should take that factor into account when considering the need for just punishment in this case. And given the ongoing problem of organized crime activity in New York, a sentence within the Guidelines range would provide for general deterrence amongst other organized crime members and associates who currently believe themselves to be operating with impunity.

The defendant contends that his current employment demonstrates his "self-motivated rehabilitation." However, it is not uncommon for organized crime members to maintain legitimate employment to explain their assets and wealth. Indeed, although defendant relies heavily on his current employment to "prove" his rehabilitation, it is worth noting that the defendant was apparently employed at the time of the instant offense (see PSR ¶ 68), and nonetheless he continued to supplement whatever legitimate income he was earning with income derived through his illegal activities. Given that organized crime members swear an "allegiance for life to the crime family," and that the defendant's cousin is currently the boss of the Gambino crime family, the Court should view with a jaundiced eye the defendant's claim that he discovered legitimate employment and a law-abiding life after nearly 30 years of membership in the Gambino crime family.

To the extent that the defendant contends that his family circumstances warrant a below-Guidelines sentence, that request should be denied. Although the defendant's family circumstances are sympathetic, the defendant is not the sole caregiver to his wife and parents and, as the PSR notes (PSR ¶ 58), three of the defendant's adult children are gainfully employed. Thus, support from other family members is available to alleviate the hardship imposed by the defendant's incarceration. See United States v. Smith, 331 F.3d 292, 294 (2d Cir. 2003) (finding that other family members may alleviate hardship of incarceration); United States v. Madrigal, 331 F.3d 258, 260 (2d. Cir. 2003) (same). Accordingly, there is nothing about the defendant's family circumstances that are so extraordinary as to warrant a below-Guidelines sentence. This is particularly true in light of the other factors under 18 U.S.C. § 3553(a), which militate heavily in favor of a sentence

7

within the applicable Guidelines range. Indeed, the seriousness of the conduct, the inherent danger such conduct poses to the community, and the need to deter the defendant specifically from returning to such conduct and others generally from committing it make clear that a sentence within the applicable Guidelines range will not be greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

IV.     Conclusion

For the foregoing reasons, the government respectfully submits that the Court should impose a sentence of incarceration between 27 and 33 months.

>                               Respectfully submitted,
>
>                               LORETTA E. LYNCH
>                               United States Attorney
>
>                      By:      /s/
>                               Amir H. Toossi
>                               Assistant U.S. Attorney
>                               (718) 254-7000

cc:     Eric Franz, Esq., Counsel for the Defendant (by ECF)